**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

TROY TAYLOR,

                Petitioner,

    v.

MARLIN GUSMAN, Sheriff of Orleans
Parish,

                Respondent.

Case No. 2:20-cv-449-SSV-DMD
Section "R" (3)

## REPLY TO "RESPONSE TO PETITION FOR HABEAS CORPUS RELIEF" (DKT. 16)

The District Attorney's Response (Dkt. 16) contains misstatements of fact and law. To rectify these errors (and to sharpen what Mr. Taylor understands to be the areas of material disagreement between the parties), this Reply addresses (1) threshold matters concerning the litigation of Mr. Taylor's claims before this Court, (2) the District Attorney's "Procedural History" (p. 2-21); (3) the Response to Mr. Taylor's presumptive vindictiveness claim (p. 24-53); (4) the Response to Mr. Taylor's actual vindictiveness claim (p. 53-62); and (5) the Response to Mr. Taylor's double jeopardy claim (p. 62-65).[1]

### I.    Threshold Matters

Although submitting a great number of documents to this Court, the District Attorney has apparently not fully complied with this Court's February 12, 2020 Order (Dkt. 13) in two respects.

---

[1]    The final three pages of the District Attorney's Response (p. 65-67) address a challenge to the constitutionality of La. C. Cr. P. art. 574. Although Mr. Taylor believes La. C. Cr. P. art. 574 to be unconstitutional, he has not urged this Court to declare it to be unconstitutional in his habeas petition. *But see infra* Part V (addressing ways in which Article 574 indirectly contributes to serious double jeopardy problem).

First, although repeatedly referencing the 2017 grand jury proceedings overseen by Ms. Patel, *see, e.g.,* Response at 44, 61-62, the District Attorney omits the transcript of these grand jury proceedings (and the transcript of a subsequent reconvening of the grand jury to "amend" the indictment). These documents were closely scrutinized by the trial court and Louisiana's appellate courts when ruling upon the instant claims,[2] and are in the District Attorney's possession. Second, the District Attorney omits the transcripts of Mr. Taylor's post-2017 court appearances. Many of these transcripts were already prepared by the Orleans Parish Criminal District Court's court reporter; the remainder could have been prepared and submitted had the District Attorney timely requested them over the past month. Mr. Taylor urges that any gaps or omissions in the record be construed against the District Attorney (although Mr. Taylor also contends that the record is more than sufficient right now to grant his requested habeas relief). *See* 28 U.S.C. § 2243 ("When the writ or order is returned a day shall be set for hearing, not more than five days after the return unless for good cause additional time is allowed. Unless the application for the writ and the return present only issues of law the person to whom the writ is directed shall be required to produce at the hearing the body of the person detained.").

## II.     Correction to the District Attorney's Procedural History

The District Attorney's "procedural history" does not deny any of the allegations contained in the Petition (Dkt. 1) ¶¶ 1-41, including both factual and jurisdictional allegations. *See* Response at 21 (stipulating claims are "subject to federal review"). In rough terms, the parties agree about

---

[2]     After conducting an *in camera* review of the grand jury transcripts, the trial court took the highly unusual step of initially ordering they be disclosed to Mr. Taylor on February 7, 2018. An intermediate state appellate court reversed this ruling in a 1-1-1 decision. *See State v. Taylor*, No. 2018-K-0192 (La. App. 4 Cir. 5/23/18). Although Mr. Taylor has never seen the documents, the trial court specifically emphasized that it reviewed and considered the grand jury transcript when it ruled upon Mr. Taylor's claims. *See, e.g.,* Ruling Tr. (Apr. 19, 2019) at 11-12. Per the District Attorney's response, they were part of the appellate record, too. *See* Response at 2.

the basic chronology. However, the District Attorney's account obfuscates several important points, briefly addressed below (and several additional matters addressed *infra* at Part IV).

### 1. Confusion Regarding Post-2017 Charges and Indictments

As noted in Mr. Taylor's Petition, one significant source of delay over the past 33 months is that the District Attorney has refused to tell Mr. Taylor whether he faces a charge of "second degree kidnapping" or "aggravated kidnapping."

The District Attorney's Response asserts that "[o]n June 29, 2017, an Orleans Parish grand jury returned a superseding indictment charging Taylor with aggravated rape and aggravated kidnapping, violations of La. R.S. 14:42 and La. R.S. 14:44, respectively." Response at 7. The actual bill of indictment indicates otherwise. *See* Petition (Dkt. 1), Ex. 5 (Bill of Indictment I). Although it is true that the back of the indictment—actually returned in open court on July 18, 2018—contains the words "aggravated kidnapping," it is also true that (1) the front of the indictment alleges Mr. Taylor "committed second degree kidnapping," (2) the front of the indictment recites the elements of second degree kidnapping, and (3) the back of the indictment lists the statute for second degree kidnapping (La. R.S. 14:44.1). *Id.*

The District Attorney notes that two years later, "[o]n July 2, 2019, the State filed a response to Taylor's motion for bill of particulars." Response at 19. The District Attorney omits that the bill of particulars, which the trial court ordered the District Attorney to provide, served one purpose—to clarify the charge after (literally) years of confusion. *See* Petition (Dkt. 1), Ex. 8 (motion for bill of particulars). And the District Attorney further omits that the bill of particulars furnished in July 2019 made clear that Mr. Taylor was facing the charge of "second degree kidnapping" under La. R.S. 14:44.1, not aggravated kidnapping under La. R.S. 14:44. *See id.*, Ex.12 (Bill of Particulars III).

Mr. Taylor does not dispute that in August 2019—after Mr. Taylor urged to dismiss the second degree kidnapping charge as time-barred—the State subsequently produced a transcript that finally established that Bill of Indictment II (which does properly list the charge of "aggravated kidnapping") was returned in court back in 2017 outside of Mr. Taylor's presence. *See id.*, Ex. 6 (Bill of Indictment II). He was finally arraigned on this charge, for the first time, on August 23, 2019, and there is no dispute as to the charges he now faces. But the contention that the "question [of what charges Mr. Taylor has been facing] can be easily clarified by a review of the record," Response at 61, is not correct.

### 2. *Affidavit of ADA Mary Glass*

On December 14, 2018, the District Attorney's office submitted an exhibit to a supplemental brief regarding Mr. Taylor's *Blackledge* claim, which consisted of an affidavit signed by ADA Mary Glass. This one-page document explains that "[her] office" thought the non-aggravated charges were timely instituted in 2011, but does not explain why she or "[her] office" opted to forego aggravated charges at that time. In the affidavit, Ms. Glass speculates that "[her] office" would have sought a grand jury indictment for aggravated charges had anyone been aware of the relevant U.S. Supreme Court precedent. Conspicuously, the affidavit does *not* state that Ms. Glass herself would have personally recommended pursuing aggravated charges, based on the evidence that she reviewed when screening the case; does not provide any factual support for the speculation of what her superiors *might* have done (had Ms. Glass been aware of binding U.S. Supreme Court precedent in 2011); and does not provide any information whatsoever about what happened in 2017 when prosecutors decided to reindict Mr. Taylor. *See generally* Mr. Taylor's "Reply to State's Memorandum" (Jan. 17, 2019) (discussing notable omissions in Ms. Glass's affidavit).

4

To be clear, Mr. Taylor does not believe Ms. Glass's affidavit in any way bolsters the District Attorney's arguments concerning Mr. Taylor's *Blackledge* claim, *see infra* Part II, but given the lengthy discussion of Ms. Glass's affidavit in the District Attorney's "Procedural History," Response at 12-14, it is striking that the District Attorney neglected to inform this Court of the following. First, Ms. Glass's affidavit was rejected in its entirety by the state courts.[4] Second, the District Attorney refused to offer live testimony from Ms. Glass or make her available for cross-examination, despite being repeatedly invited to do so.[5] Third, the District Attorney fought to prevent Mr. Taylor from subpoenaing Ms. Glass—requesting, and receiving, a potentially lengthy "indefinite stay" of all pre-trial proceedings while it litigated the issue on appellate writs. *See* Ruling Tr. (Feb. 1, 2019) at 14-15 (granting District Attorney's request for indefinite stay, over Mr. Taylor's objection, if Mr. Taylor wanted to subpoena Ms. Glass). Finally, the District Attorney fails to mention *why* Mr. Taylor eventually withdrew his request to subpoena Ms. Glass; the District Attorney stipulated that "Ms. Glass's opinion regarding the factual basis for the current charges is irrelevant" to Mr. Taylor's presumptive vindictiveness claim. *See* Withdrawal of Subpoena Applications & Assertion of Constitutional Rights (Mar. 18, 2019) at 1 (quoting District

---

[4]   *See* Ruling Tr. (Apr. 12, 2019) ("MR FRAMPTON: Judge, in our final filing [objecting to hearsay], we also discussed the affidavit of Mary Glass, which was submitted. As a point of clarification, was Ms. Glass' affidavit in any way taken into account with respect to evidence in favor of the State or in favor of Mr. Taylor with respect to the motions? THE COURT: No, it was not. MR. FRAMPTON: It was not -- THE COURT: No. MR. FRAMPTON: -- taken into account? THE COURT: No."); *see also* La. R. Evid. art. 1102(B) (prohibiting such evidence).

[5]   *See, e.g.*, Mr. Taylor's Reply Br. (Apr. 8, 2019) at 6-7 ("[T]he State has assiduously opposed the requested evidentiary hearing, has vociferously fought the introduction of any live testimony, and has made the curious decision *not* to submit an affidavit or offer live testimony from anyone with first-hand information on the [2017] re-charging decision. Here are things the State could easily do: Call Ms. Glass to testify (or ask her to amend her affidavit) to say, 'I believed there was a good faith basis to pursue aggravated charges in 2011.' *Her affidavit lacks this assertion because it is not true*. . . . There are no 'facts' in the record whatsoever at this point, despite Mr. Taylor['s] repeated invitations for the State to adduce such evidence.").

Attorney's Fourth Circuit Writ Application, *State v. Taylor*, No. 2019-K-0187 (Feb. 27, 2019) at 13).

### III.     Presumptive Vindictiveness

The District Attorney's Response does not dispute that, because prosecutors increased the severity of the specific charges Mr. Taylor faced after Mr. Taylor's successful appeal, the presumption of vindictiveness arises. In other words, it appears uncontested that Mr. Taylor has asserted a traditional *Blackledge* claim (rather than a *Goodwin* claim) that triggers the presumption of vindictiveness, and that the framework governing *Blackledge* claims applies. This is critical because the *Blackledge* doctrine exists to regulate what prosecutors may do after a defendant successfully appeals a conviction, and none of the cases cited by the District Attorney involve this issue; instead, the District Attorney relies exclusively on case law discussing what prosecutors may do before a trial (*i.e.*, *Goodwin* claims) where prosecutorial discretion is nearly unlimited. But, as the case law makes clear, an increase in the severity of charges *after* trial offends the Due Process Clause, even if precisely the same conduct by prosecutors in the pre-trial setting would be permissible. *See, e.g., United States v. Slatten*, 865 F.3d 767, 799 (D.C. Cir. 2017) ("For this reason, a presumption of vindictiveness will automatically arise whenever charges are increased post-trial, but in the pre-trial context, a defendant must provide additional facts sufficient to show that all of the circumstances, when taken together, support a realistic likelihood of vindictiveness.") (internal citations and quotations omitted).

Thus, although the parties agree that the presumption of vindictiveness attaches, the parties disagree as to (1) whether the presumption of vindictiveness that arises in a traditional *Blackledge* setting is rebuttable, and (2) whether the District Attorney can rebut it here.

### A.     The Presumption is Not Rebuttable.

To counter the unambiguous language in *Deloney v. Estelle*, 713 F.2d 1080 (5th Cir. 1983) (explaining that, for traditional *Blackledge* claims, the presumption of vindictiveness "establish[es] a *per se* due process violation" that prosecutors may not rebut), the District Attorney relies not on subsequent authority, but on a case decided five years earlier. *See Jackson v. Walker*, 585 F.2d 139 (5th Cir. 1978). *Jackson*, however, actually announced the basic rule later echoed in *Deloney*, and held that prosecutors enjoy the opportunity to muster a rebuttal to the presumption only in unique settings unlike those present in *Blackledge* and Mr. Taylor's case. The *Jackson* court distinguished between cases in which prosecutors bring "harsher variations" of the original charges after appeal (i.e., a traditional *Blackledge* claim), and situations in which prosecutors bring new charges for "different and distinct activities" after an original appeal. 585 F.2d at 143. The *Jackson* court explained that this distinction mattered, and prosecutors should be given the opportunity to rebut the presumption if they have brought charges for "different and distinct" activities after a successful appeal. But *Jackson* actually affirmed the basic rule that, with a true *Blackledge* claim, the presumption of vindictiveness is irrebutable. *See* Petition (Dkt. 1) at 20-21 (citing *Jackson*, 585 F.2d at 143).[6]

---

[6]     The District Attorney is right that there is dicta in *Dvorin* seems to contemplate the prosecutors *might* have an opportunity to rebut the presumption, even when the defendant asserts a tradition *Blackledge* claim. *See* Response at 26. But this is dicta because the *Dvorin* court goes went on to explain that the precise sort of rationale advanced by prosecutors here ("We made a 'mistake' filing the initial charges") would not suffice.

The District Attorney's additional reliance on *Paradise v. CCI Warden*, 136 F.3d 331 (2d Cir. 1998) for the proposition that prosecutors may rebut the presumption of vindictiveness in a traditional *Blackledge* setting is entirely misplaced. As Mr. Taylor already explained in his Petition, *Paradise* was not a "presumptive vindictiveness" case and did not address whether a *Blackledge* presumption could be rebutted, because the defendant never went to trial in the first instance. The defendant there was bringing a *Goodwin* claim, requiring a showing of actual malice because it arose in a pre-trial setting. *See* Petition (Dkt. 1) at 22, n.11. It is extraordinarily misleading to suggest, as the District Attorney does, that in *Paradise* "[t]he Second Circuit disagreed with the defendant's argument" that the *Blackledge* presumption is irrebuttable. Response at 26. Rather, the Second Circuit disagreed with the defendant's argument that pre-trial

### B.   The Arguments Presented in the District Attorney's Brief Fail to Rebut the Presumption of Vindictiveness in Mr. Taylor's Case.

Ultimately, whether the presumption  of vindictiveness may, generally speaking, be rebutted is immaterial, because the District Attorney's arguments in Mr. Taylor's case fall far short of rebutting the presumption. The District Attorney's basic contentions come down to the following:

(1) We erred in concluding that the forcible rape and second-degree kidnapping charges were timely instituted when we charged Mr. Taylor in 2011. *See* Response at 33 ("The State made a mistake in the initial charging of this case . . .").

(2) This mistake was reasonable because "an intervening change in the law" in 2015 revealed our initial belief to be wrong, *see id.* at 9, 28, 29, 32, and "the State could not have foreseen" this development, *id.* at 12, 29, 33, 34.

(3) Had prosecutors not made the reasonable mistake described in (1) and (2), the District Attorney in 2011 would have brought the aggravated charges. *Id.* at 33, 35 ("[T]he State undoubtedly would have sought and obtained an indictment for the charges . . .").

(4) When Ms. Patel opted to seek a grand jury indictment in 2017, her sole subjective motivation was to put the District Attorney in the same position that prosecutors would have occupied had (1) and (2) not occurred (i.e., to replicate (3)).

(5) Assuming (1)-(4) to be true, the law recognizes our desire to "hold Mr. Taylor responsible" precisely as we initially sought to hold him responsible—before we knew the law prohibited such punishment—to be a valid legal justification to defeat a *Blackledge* claim. *Id.* at 33.

Each of these propositions (1)-(5) must be true for the District Attorney to prevail; the problem is that Propositions (2), (3), (4), and (5) all independently fail.

**Proposition (2):** Our mistake was reasonable because "an intervening change in the law" in 2015 revealed our initial belief to be wrong, *see id.* at 9, 28, 29, 32, and "the State could not have foreseen" this development, *id.* at 12, 29, 33, 34.

---

conduct by prosecutors could *ever* give rise to a "presumption" in the first instance; quite unremarkably, the appellate court simply held that the "presumption of prosecutorial vindictiveness does not exist in a pretrial setting." 136 F.3d at 336.

The District Attorney's Response refers to "an intervening change in law" eight times, Response at 9, 28, 29, 32, and it claims the District Attorney could "not have foreseen" this change four times, *id.* at 12, 29, 33, 34.[7] The basic claim is that a Louisiana Supreme Court opinion in 2015 first signaled to prosecutors that the (then seventeen years old) forcible rape and second-degree kidnapping charges instituted in 2011 might have been time-barred. But **Proposition (2)** is nonsense, and Louisiana courts have expressly held as much.

Mr. Taylor's 2011 charges were time-barred because U.S. Supreme Court precedent, decided in 2003, commanded that result. *See State v. Troy Taylor*, --- So.3d ---, 2016-1252, 2017 WL1282124, at *5 (La. App. 4 Cir. 4/6/17) (holding charges were clearly time-barred under *Stogner*), *writ denied*, 221 So.3d 845 (La. 6/16/17); *Stogner v. California*, 539 U.S. 607 (2003). Specifically, both of Mr. Taylor's charges carried a six-year statute of limitations period, which expired more than eleven years before Mr. Taylor's trial. *Id.* True, the Louisiana Legislature passed a law in 2003 that purported to extend the statute of limitations for certain sex offenses, *see* Act No. 487 (2003), but the statute of limitations in Mr. Taylor's case had already run by then. Both existing Louisiana law and U.S. Supreme Court precedent made clear that Act No. 487 did *not* apply to "resurrect" cases like Mr. Taylor's (i.e., offenses for which the statute of limitations had already run). *See Stogner v. California*, 539 U.S. 607 (2003) (holding Ex Post Facto Clause prohibited "resurrection" of time-barred sex charges after initial statute of limitations had run); *see also State v. Troy Taylor*, 2016-1252 (La. App. 4 Cir. 4/6/17), *writ denied*, 221 So.3d 845 (La. 6/16/17) ("*Stogner* made no change in Louisiana law [because] the Louisiana Supreme Court has

---

[7]      To be clear, prosecutors do not claim that there was a "change in the law" that made it possible, for the first time after Mr. Taylor's appeal, to bring aggravated rape and aggravated kidnapping charges (which is the only sense in which "change in the law" ever appears in the *Blackledge* jurisprudence). There is no dispute that the law allowed prosecutors to bring the aggravated charges first filed in 2017 at all relevant times.

long subscribed to the rule that the state may extend the time limits for instituting prosecution and apply them against a particular defendant, but only if the prior limitation period has not expired.").

As the Louisiana courts recognized in 2017, any reasonable attorney in 2011 would have known that Mr. Taylor's charges were time-barred under *Stogner* (and under Louisiana case law existing both before and after *Stogner*). *State v. Troy Taylor*, 2016-1252, *5 (La. App. 4 Cir. 4/6/17) (finding deficient performance under *Strickland* for trial counsel's apparent ignorance of *Stogner*). Indeed, the Orleans Parish District Attorney first tested this argument—*i.e.*, that there was some ambiguity in the law in 2011 when Mr. Taylor was convicted—in opposing Mr. Taylor's ineffective assistance of counsel arguments in post-conviction proceedings. Louisiana appellate courts had no trouble dismissing the District Attorney's argument, explaining:

> [C]ounsel does not err by lacking clairvoyant powers. *See State v. Wolfe*, 630 So.2d 872, 883 (La. App. 4th Cir. 1993) (counsel not ineffective for failing to anticipate change in jurisprudence or object when under then-law any objection would have been vain and useless act); *see also Sistrunk v. Vaughn*, 96 F.3d 666, 670–71 (3d Cir. 1996) (counsel has "no general duty to anticipate changes in the law") (citation and internal quotation marks omitted); *Lucas v. O'Dea*, 179 F.3d 412, 420 (6th Cir. 1999) (only in "rare cases" and when change in law is "clearly foreshadowed" may court find ineffective assistance based on counsel's failure to raise claim that would have been overruled under then prevailing law). In the instant case, however, there was well-established precedent, as set forth by both the United States Supreme Court in *Stogner,* and the Louisiana Supreme Court in *Rolen* and *Ferrie,* establishing that La. C. Cr. P. art. 572(B) could not withstand ex post facto scrutiny. On the facts of this particular case, we find that counsel's decision not to move to quash the forcible rape charge fell below 'an objective standard of reasonableness,' which is the first prong of the *Strickland* test.

*State v. Taylor*, 2016-1252, *4-5 (La. App. 4 Cir. 4/6/17). In short, the District Attorney's claim that prosecutors had "no reason to believe [their prosecution of Mr. Taylor] would later be found to violate the *ex post facto* clause," *see* Response at 31, is manifestly untrue.

The Louisiana Supreme Court's holding in *Nicholson* did not constitute an unforeseeable "intervening change in law" in 2015. In fact, the Orleans Parish District Attorney's office

apparently admitted as much in *Nicholson* itself (a case in which the same District Attorney also sought—unlawfully—to chemically castrate the defendant). *State ex rel. Nicholson v. State*, 169 So.3d 344, 348 (La. 5/5/15) ("[T]he portion of the court's sentence requiring that relator submit to chemical castration is vacated."). In *Nicholson*, the defendant (just like Mr. Taylor) was charged by the Orleans Parish District Attorney with sex offenses for which the statute of limitations had run. *See* 169 S.3d 344 (La. 5/5/15). Prosecutors nevertheless pursued the charges. S*ee* 169 S.3d 344 (La. 5/5/15). Citing *Stogner*, the defendant successfully challenged his convictions under both the federal and Louisiana Constitutions. *State ex rel. Nicholson v. State*, 169 So.3d 344, 347 (La. 2015). Apparently even the Orleans Parish District Attorney recognized that it could not "resurrect" a time-barred offense, as he had done with Mr. Nicholson. *See id.* ("The [Orleans Parish District Attorney] has conceded as much in this Court."). There was simply nothing in Louisiana jurisprudence at the time *Nicholson* was decided in 2015 hinting that a straightforward application of *Stogner* didn't dictate this result.

Nevertheless, the District Attorney *now* implies that Mr. Taylor's prosecutors reasonably relied on *State v. Nicholson*, 10-1430 (La. App. 4 Cir. 10/13/10) and *State v. Nicholson*, 46 So.3d 1287 (La. 10/18/10) when they concluded that Mr. Taylor's charges were timely instituted, and that this impression was not dispelled until the "unforeeable" change in the law in 2015. To be clear, Louisiana's appellate courts *never* held that that *Stogner* was inapplicable to cases like Mr. Taylor's (or even to Mr. Nicholson's). Mr. Taylor asks that this Court look up the two 2010 citations involving *Nicholson* to confirm what they show: literally nothing. Rather, the aforementioned 2010 citations refer to moments when Mr. Nicholson's case was in a pre-trial posture in Orleans Parish Criminal District Court, and Louisiana's appellate courts declined to take the extraordinary step of using their supervisory jurisdiction to grant a discretionary application

for interlocutory relief filed by Mr. Nicholson and halt the prosecution. The Fourth Circuit did so in an unwritten and unpublished one-word order, which in no way held that the Orleans Parish District Attorney's actions were lawful (or that *Stogner* might not apply for some reason). *State v. Nicholson*, 10-1430 (La. App. 4 Cir. 10/13/10). The Louisiana Supreme Court did the same a few days later. *State v. Nicholson*, 46 So.3d 1287 (La. 10/18/10). But under Louisiana law:

> a writ *denial,* as well as the reasons given therefor, are not authoritative and do not make law. A denial of supervisory review does not constitute the court's considered opinion on the allegations made in a writ application, but is merely a decision not to exercise the extraordinary powers of supervisory jurisdiction in that case. The denial by a court of appeal of a writ application seeking to invoke that court's supervisory jurisdiction neither "blesses nor adopts the [trial court's] factual determination or expressions of law." *McClendon v. State, Dept. of Transp. and Development,* 642 So.2d 157, 158 (La. 1994).

*Leblanc v. 1555 Poydras Corp.*, 156 So. 3d 1222, 1226 (La. App. 4 Cir. 12/17/14) (emphasis in original) (internal citations omitted). *Accord Davis v. Jazz Casino Co., L.L.C.,* 849 So.2d 497, 498 (La. 2003).

The disingenuity of the District Attorney's position is even more plain if we focus in particular on Mr. Taylor's second-degree kidnapping conviction, which was vacated on direct appeal in 2013, two years before *Nicholson* was decided. *See State v. Taylor*, 118 So.3d 65 (La. App. 4 Cir. 6/26/13), *writ denied* 134 So.3d 1169 (La. 2014). The District Attorney today claims that it was impossible to foresee that Mr. Taylor's charges were time-barred until the Louisiana Supreme Court remade the governing law in 2015, yet *Nicholson* was irrelevant to the appellate courts' decision to vacate Mr. Taylor's kidnapping conviction in 2013 (just as it was irrelevant to the appellate court's decision to vacate Mr. Taylor's rape conviction in 2017). *Id.* The legal infirmities in the District Attorney's original prosecution of Mr. Taylor had nothing to do with *Nicholson*.

In short, the District Attorney's purported reliance on an unpublished denial of a discretionary writ application in *Nicholson* (which "d[id] not make law") is risible. It amounts to the argument: "At that very moment in 2010, we were attempting the same manifestly unconstitutional tactic with another pre-trial defendant, and no one had yet caught us." Even if the unpublished writ denials in *Nicholson* did "make law," reliance on these state court writ denials (over a U.S. Supreme Court opinion that held the exact opposite in a case also involving the "resurrection" of time-barred sex offenses) would be improper. *See* U.S. Const., Art. VI, cl. 2. This is not just Mr. Taylor's argument; Louisiana courts have already said the foregoing in no uncertain terms. *State v. Taylor*, 2016-1252, *4-5 (La. App. 4 Cir. 4/6/17) (explaining that it was obvious Mr. Taylor's charges were time-barred in 2011 and no "clairvoyant powers" were needed to see this).

There simply was no "intervening change in law" (as Louisiana courts have already explained) and the result was perfectly foreseeable (as Louisiana courts have already explained). *Cf. United States v. Tobin*, 598 F. Supp. 2d 125, 131 (D. Me. 2009) (noting the defendant's legal success was hardly "unforeseeable" because the defendant foresaw the problem and raised it on appeal).

> **Proposition (3):**  Had prosecutors not made the reasonable mistake described in (1) and (2), the District Attorney in 2011 would have brought the aggravated charges. *Id.* at 33, 35 ("[T]he State undoubtedly would have sought and obtained an indictment for the charges . . .").

The District Attorney then claims, without support, that "there is *no* doubt that [had prosecutors been aware of U.S. Supreme Court precedent] the State would have secured an indictment against Taylor for aggravated [charges]" in 2011. Response at 33 (emphasis in original); *see also id.* at 35. With respect, there is much doubt.

13

The District Attorney's sole evidence for what prosecutors *might* have done in 2011, had they known the law, is an inadmissible and previously rejected affidavit signed by ADA Mary Glass. In the affidavit, Ms. Glass states that she participated in the "screening" of Mr. Taylor's case in 2010, and that if she were aware of *Stogner*, she believes "[her] office" would have attempted to seek a grand jury indictment for aggravated charges. But, as noted *supra*, (1) Ms. Glass's affidavit was properly rejected by the trial court; (2) the District Attorney refused to offer live testimony from Ms. Glass (despite being repeatedly invited to do so); (3) the District Attorney fought to prevent Mr. Taylor from subpoenaing her; and (4) the District Attorney stipulated that her testimony was irrelevant.

Should Ms. Glass actually appear, Mr. Taylor would seek answers to questions the District Attorney has assiduously refused to answer for the past 33 months. Specifically, he might have the opportunity to ask: "Regardless of prosecutors' ignorance of (or perhaps disregard for) *Stogner v. California*, why were aggravated charges rejected in 2011? Would you (Ms. Glass) personally have recommended pursuing 'aggravated' charges in 2011 had you been aware of *Stogner*, or are you simply speculating that '[your] office' would have done so, lack of supporting evidence[9] notwithstanding?" Ms. Glass's affidavit is conspicuously silent on these points. Mr. Taylor proffers that the likely answers—prosecutors never even contemplated aggravated charges in

---

[9]    The District Attorney insists at other points in the Response that the complaining witness's account provided more than enough basis for charging Mr. Taylor with aggravated rape and aggravated kidnapping in 2011. *See* Response at 52. But, if true, this actually compounds the *Blackledge* violation, insofar as it indicates that prosecutors actually considered and decided to forego aggravated charges as inappropriate in 2011. The assertion that "prosecutors thought the non-aggravated charges were timely instituted" certainly helps explain why they instituted those charges in 2011, but it provides no insight into the all-important question why they opted in 2011 *not* to institute the aggravated charges that they subsequently brought in 2017.

2011, because the complaining witness didn't allege those crimes—would cast substantial doubt on the veracity of Proposition (3).

> **Proposition (4):** When Ms. Patel opted to seek a grand jury indictment in 2017, her sole subjective motivation was to put the District Attorney in the same position that prosecutors would have occupied had (1) and (2) not occurred (i.e., to replicate (3)).

Proposition (4) is important because ultimately the question of whether Mr. Taylor's rights under the Due Process Clause were violated hinges not just what happened in 2010-11, but also on what occurred when prosecutors made the decision to (re)prosecute him in 2017. The Due Process violation occurs not when prosecutors forego the more serious charges in the first instance, but at the moment when they opt to exercise their discretion in a different, harsher fashion following an appeal. *See Blackledge v. Perry*, 417 U.S. 21, 28 (1974). Yet despite its centrality to the case, the District Attorney does not expressly allege Proposition (4) anywhere in the Response, nor has the District Attorney expressly claimed as much in other briefing. During the past 33 months, the District Attorney has consistently refused to proffer an affidavit from Ms. Patel, has not made her voluntarily available for testimony, and has fought Mr. Taylor's efforts to subpoena her. The absence of any evidence in support of Proposition (4) is attributable solely to prosecutors' tactical decisions in opposing Mr. Taylor's claims.

> **Proposition (5):** Assuming (1)-(4) to be true, the law recognizes our desire to "hold Mr. Taylor accountable" precisely as we initially sought to hold him responsible—before we knew the law prohibited such punishment—to be a valid legal justification to defeat a *Blackledge* claim. *Id.* at 33.

But even if the District Attorney could prove Propositions (1), (2), (3), and (4), the greater obstacle for the District Attorney is that Proposition (5) fails as a matter of law. Even taking as true everything the District Attorney might adduce at an evidentiary hearing (which the District Attorney has not requested), Mr. Taylor is still entitled to relief.

As explained at length in Mr. Taylor's Petition, Proposition (5) has been roundly rejected by the courts. Prosecutors regularly respond to *Blackledge* claims by protesting they do not seek to *punish* the defendant, but rather aim to "hold him accountable" through new charges necessitated by the defendant's appeal. And the courts have *never* accepted this explanation when dealing with a true *Blackledge* claim (i.e., a claim involving prosecutors' decision to increase the harshness of a particular charge after a successful appeal). As succinctly summarized in *United States v. Tobin*:

> To rebut adequately a presumption of vindictiveness, the government must demonstrate "objective reasons for its charges." *United States v Jenkins*, 537 F.3d 1, 3 (1st Cir. 2008); *see also United States v. Goodwin,* 457 U.S. 368, 376 n. 8 (1982) (requiring "objective evidence justifying the prosecutor's action."); *United States v. Rosenthal,* No. CR 02-0053, 2007 WL 801647, at *2 (N.D.Cal. Mar. 14, 2007) (characterizing burden as "heavy"). Here, those reasons do not include several that the government routinely invokes, such as newly discovered evidence or intervening criminal activity. . . . The government does not cite any material change in the [relevant] law . . . or suggest that it recently secured jurisdiction over the instant charges. *See United States v. Marrapese,* 826 F.2d 145, 149 (1st Cir. 1987); *United States v. Ward,* 182 F. App'x 779, 788 (10th Cir. 2006). Nor does the government claim to have communicated to [the defendant] its intent to pursue [the more serious charges] before or during his [initial] trial. *See Rosenthal,* 2007 WL 801647, at *4. In fact, it concedes that it never notified him of any such possibility. (*See* Feb. 9, 2009 Tr. (Docket # 52) at 45:23–46:3.)
>
> Rather, the government's loss on appeal constitutes its primary justification: "the [new] Indictment was brought in response to unforeseen legal infirmities identified in *Tobin I* with the two [initial] counts of conviction." (Government's Resp. (Docket # 28) at 12–13.) By October 2008, the government anticipated that the [appellate court] would affirm Tobin's acquittal. **Because it would have been "irresponsible" to allow [the defendant] to go unpunished, the government decided to pursue [the new] charges.** (*Id.* at 19.)
>
> **This will not do.** The aforementioned "legal infirmities"—previously identified by [the defendant] and thus hardly "unforeseen"—were diagnosed by the [appellate court] only because Tobin exercised his right to appeal; **the government's explanation, though sincere and entirely plausible, justifies nothing.** A loss on appeal may occasion the consideration of new charges, but it cannot justify the government's decision to bring those charges. To rebut a presumption of vindictiveness, the government must offer more. *See Lovett v. Butterworth,* 610

> F.2d 1002, 1006 (1st Cir. 1979) (suggesting that the government must offer "new facts unrelated to the appeal").

*United States v. Tobin*, 598 F.Supp.2d 125, 131 (D. Me. 2009) (emphasis added). This is true where the defendant's assertion of his rights has "eviscerate[d]" prosecutors' ability to bring the initially selected charges, *see United States v. LaDeau*, 734 F.3d 561, 569 (6th Cir. 2013), and also true when the initially selected charges are now time-barred after a successful appeal, *United States v. Korey*, 614 F.Supp.2d 573 (W.D.Pa. 2009); *United States v. Korey*, No. 08-CR-0039, 2009 WL 1940381, *1 n.1 (W.D. Pa. June 30, 2009). *See also* Petition at 24-28 (collecting similar cases); *State v. Dvorin*, 817 F.3d 438, 456 (5th Cir. 2016) (rejecting "mistake" with initial charges as valid excuse for instituting harsher charges in *Blackledge* setting after defendant's appeal).

In sixty-eight pages, the District Attorney does not identify a single case wherein a court (at any level) accepted the contention that a "mistake" akin to the one prosecutors allegedly made here could dispel the presumption of vindictiveness that arises in a traditional *Blackledge* setting, after prosecutors have gone through the trouble of securing a conviction at trial and after a defendant's appeal has nullified those efforts. Just as Mr. Taylor anticipated the District Attorney would do, *see* Habeas Petition at 22-23 n.11, the District Attorney yet again relies heavily on *Paradise*, *Slatten*, and *Gardner*, *see* Response at 35-40. But none of those cases involved traditional *Blackledge* claims and none address limits on prosecutorial discretion after a defendant's successful appeal. They do not provide answers to the question "What showing is needed to rebut the presumption of vindictiveness in a *Blackledge* case?" because none of those cases are true *Blackledge* cases. *Paradise*, *Slatten*, and *Gardner* were simply *Goodwin* cases in which no presumption of vindictiveness arose because the defendant had never been tried; the respective courts themselves chastised the parties for papering over this critical difference (just

as the District Attorney has again done here). *See, e.g., Paradise v. CCI Warden*, 136 F.3d 331, 336 (2d Cir. 1998); *United States v. Slatten*, 865 F.3d 767, 799 (D.C. Cir. 2017). Far more apposite are the many cases cited by Mr. Taylor that *do* address the question whether a "mistake" can defeat the presumption of vindictiveness in a post-appeal setting. These cases uniformly hold that such a "mistake" does not suffice. *See, e.g., Dvorin*, 817 F.3d at 456; *LaDeau*, 734 F.3d at 569; *Tobin*, 598 F.Supp.2d at 131.

* * *

If this Court disagrees with the aforementioned analysis of Proposition (5), Mr. Taylor's claim should still be granted because the District Attorney has not met its burden of adducing evidence to support Propositions (2)-(4). Importantly, the District Attorney has not sought an evidentiary hearing to carry the District Attorney's heavy burden of rebutting the presumption (assuming it to be rebuttable).

### IV.   Actual Vindictiveness

Mr. Taylor urges that prosecutor Payel Patel acted with actual vindictiveness in re-indicting him for two charges, each carrying mandatory life without parole sentences; the District Attorney opposes this claim. *See* Response at 53-62.  There is substantial disagreement concerning the significance of various events during Mr. Taylor's long ordeal (and the proper inferences to be drawn from those inferences).

Several points bear emphasis from the District Attorney's Response to the "actual vindictiveness" claim, however, and it is important to recognize that these facts are *not* in dispute. First, the District Attorney does not deny that two witnesses provided false testimony against Mr. Taylor in 2011, and that Ms. Patel was aware of this fact as jurors deliberated (but refused to notify the court or the jurors). *See* Response at 58. The District Attorney merely argues that this

misconduct did not violate Mr. Taylor's right to due process. *Id.*[10] Second, the District Attorney does not deny that Ms. Patel falsely told the trial court that she was pursuing Mr. Taylor for "aggravated rape" on the legal theory that the complaining witness resisted the act "to the utmost" (when Ms. Patel argued the exact opposite to the jury in 2011, and, on information and belief, nothing in the grand jury transcript would support her claim.)[11] Third, the District Attorney places the blame for the delays over the past several years on Mr. Taylor, faulting him for not filing an "Article 701 motion." *See* Response at 59. But an "Article 701 motion" operates under Louisiana law as a waiver of all other motions a defendant might file. Only because Mr. Taylor still has not received basic discovery, still has not received a hearing on his motion to suppress evidence, and, until August 2019, still did not know what charges he faced, has he refrained from filing this motion.[12] The delays are attributable solely to the District Attorney. And fourth, while it is entirely true that the District Attorney may lawfully offer Mr. Taylor any plea offer (or no plea offer at all), *see* Response at 54-55, the District Attorney ignores the gravamen of Mr. Taylor's concern. The issue is that not only have prosecutors offered Mr. Taylor the opportunity to go home tomorrow (if he forfeits his rights), but also their insistence that he remain imprisoned on $2,000,000 bail if he declines this offer.

---

[10]   The District Attorney's extra-record assertion that the bar complaint filed against Ms. Patel "was dismissed," Response at 58, is misleading. The complaint was not dismissed on the merits, but rather dismissed pending resolution of Mr. Taylor's criminal case.

[11]   Mr. Taylor has filed motions for *Brady* information specifically seeking details of any accounts the complaining witness might have given that contradict her 2011 trial testimony, and the State has answered that no such statements exist. Thus, although he has not seen the transcript, if the complaining witness *had* told the grand jury in 2017 that she resisted the act "to the utmost," Mr. Taylor has faith that prosecutors would have disclosed this. Mr. Taylor requests that this Court consult the grand jury transcript(s) to see if there was any factual basis for Ms. Patel's representations to the trial court.

[12]   This would obviously be easier for this Court to appreciate if the District Attorney had filed transcripts, as ordered, since the parties have regularly disputed this point on the record.

Combined with the evidence supporting Mr. Taylor's presumptive vindictiveness claim, the undisputed facts suffice to establish "actual vindictiveness," as well.

### V.  Double Jeopardy

The District Attorney argues that the Double Jeopardy Clause does not bar the retrial of Mr. Taylor—for greater, lesser, or even the same exact charges—despite his appellate victories in 2014 and 2017 because of the "continuing jeopardy" rule. *See* Response at 62-64. The appellate court's determination that Mr. Taylor's charges were time-barred, the District Attorney argues, is no different than a ruling that there was an erroneous jury instruction during his first trial. *Id.* This was the precise argument that the U.S. Supreme Court rejected a century ago in *Oppenheimer*, when it held that a plea arguing a conviction was time-barred was a "plea to the merits."

The only contrary authority the District Attorney cites is *State v. Cahoon*, 203 P.3d 957 (Utah 2009), but again, the District Attorney misrepresents the case law. In *Cahoon*, the defendant was initially charged with time-barred offenses, but he was never put in jeopardy; prosecutors filed an amended bill of information that charged non-time-barred offenses, and they did so well before the defendant was put on trial (contemporaneously with an agreed-upon dismissal of the initial charges). *See id.* at 957-58. The Utah Supreme Court held that the Double Jeopardy Clause did not bar the prosecution of the defendant on the new charging instrument. *Id.* at 958. In so doing, the Utah Supreme Court explained:

> The rule that double jeopardy 'protects against a second prosecution for the same offense after acquittal,' *Justices of Boston Mun. Court v. Lydon,* 466 U.S. 294, 306–07 (1984), must be read in combination with the rule that the 'state of jeopardy attaches when a jury is empaneled and sworn, or, in a bench trial, when the judge begins to receive evidence,' *Martin Linen Supply Co.,* 430 U.S. 564 569 (1977). The logical conclusion of reading these two rules together is that **pretrial determinations are not acquittals for purposes of double jeopardy analysis**. This conclusion **leaves open the question of whether the same determination, if made after a trial commenced, could function as an acquittal**. We do not reach this question.

20

*Id.* at 960 (emphasis added). *Cahoon*, by its own terms, does not stand for the proposition that "*Oppenheimer* does not apply" in Mr. Taylor's case, Response at 64; rather, *Cahoon* stands for the proposition that a defendant (at least in Utah) cannot argue he has been "acquitted" under *Oppenheimer* if he was never subjected to trial. *Id.* at 960.

In contrast to the defendant in *Cahoon*, Mr. Taylor's convictions were vacated on statute-of-limitation grounds on appeal—there was a determination that went to "the merits"—and *Oppenheimer* provides that this determination operates as an acquittal.[13] Having had his conviction vacated on the "merits," Mr. Taylor cannot be retried for *aggravated* versions of the same exact offenses that were just disposed of on "the merits." *Ohio v. Johnson*, 467 U.S. 493, 501 (1984) ("[T]he Double Jeopardy Clause prohibits prosecution of a defendant for a greater offense when he has already been tried and acquitted or convicted on the lesser included offense."); *Brown v. Ohio*, 432 U.S. 161, 168 (1977) ("'[W]here . . . a person has been tried and convicted for a crime which has various incidents included in it, he cannot be a second time tried for one of those incidents without being twice put in jeopardy for the same offense.' [*Ex parte Nielsen*, 131 U.S. 176, 188-89 (1889).] Although in this formulation the conviction of the greater precedes the conviction of the lesser, the [cited] opinion makes it clear that the sequence is immaterial.").

---

[13]   The Double Jeopardy Clause bars retrial not only when an appeals court vacates a conviction for insufficient evidence, and when the appeals court determines that a charge is time-barred, but in all other instances where the appellate decision operates as the functional equivalent of an acquittal. *See, e.g., State v. Soucie*, 123 N.E.2d 888 (Ind. 1955) ("The law is well settled that where an accused person is discharged by virtue of a statute providing a limited time within which prosecution may be had, such discharge is a bar to subsequent prosecution for the same offense." (citing 15 Am.Jur., Criminal Law, § 342, pp. 31-32; 22 C.J.S., Criminal Law, § 223, p. 349; 3 A.L.R. Annotation page 519)).

Separate and apart from the foregoing—*i.e.*, even if the District Attorney could lawfully subject Mr. Taylor to jeopardy for aggravated rape and aggravated kidnapping—a quirk of Louisiana law dictates that his forthcoming trial for aggravated rape and aggravated kidnapping will *also* constitute a second trial for the very same non-aggravated offenses at issue in 2011. By operation of several provisions of the Louisiana Code of Criminal Procedure, the jury in Mr. Taylor's forthcoming trial must be charged with determining whether Mr. Taylor committed the non-aggravated 2011 offenses; under Louisiana's unique Article 574, a conviction for such a non-aggravated offense will be treated as lawful (even though the offense is time-barred). The District Attorney apparently misunderstands this argument simply as a challenge to the constitutionality of Article 574, Response at 65-67, and then argues that this constitutional claim is "not yet ripe for review," *id.* at 66.

To be clear, the specific claim advanced in Mr. Taylor's habeas petition is one properly raised in the § 2241 context: he does not want to be subject to jeopardy for forcible rape and second-degree kidnapping yet again—in violation of the Double Jeopardy Clause—but such an outcome is certain if this Court denies him relief.[14] The District Attorney suggests that Mr. Taylor should be grateful for this opportunity, since it is a "benefit" to Mr. Taylor for his jurors to have "a less severe choice." Response at 65. Not so. As the U.S. Supreme Court has recognized, sometimes "a lesser included offense instruction . . . is to the benefit of the defendant, [but] there may well be cases" (like Mr. Taylor's) "where the defendant will be confident enough that the State has not proved [the greater charge] that he will want to take his chances with the jury [not having the option of a time-barred lesser included verdict]." *Spaziano*

---

[14]   There is no dispute that this is what certainly will occur and by operation of state law; if Mr. Taylor's claim on this point is "not ripe," it's hard to see how any pre-trial double jeopardy claim would be ripe.

*v. Florida*, 468 U.S. 447, 450 (1984). That is the case here; Mr. Taylor does not seek the

"benefit" of being retried for the same (time-barred) non-aggravated offenses and he asserts that,

per *Oppenheimer*, such a trial would offend the Double Jeopardy Clause because those specific

offenses have already been resolved on the "merits."

<u>CONCLUSION</u>

For the foregoing reasons, Mr. Taylor renews his request that this Court grant his habeas

petition.

Respectfully submitted,


<u>/s/ *Thomas W. Frampton*</u>
Thomas W. Frampton, La. Bar No. 35775
*Counsel for Petitioner Troy Taylor*
Climenko Fellow & Lecturer on Law
Harvard Law School
106 Griswold Hall, 1525 Massachusetts Avenue
Cambridge, MA 02139
(202) 352-8341 (c)
(504) 821-5285 (f)
tframpton@law.harvard.edu
*Affiliation for Identification Only*



<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing response has been filed with the Clerk

of this Court by using the CM/ECF System, which will send a notice of electronic filing

to opposing counsel of record, on this the 16th  day of March, 2020.